CRAIG CARPENITO
United States Attorney
By: MARK C. ORLOWSKI
Assistant U.S. Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102
(973) 645-2760
Attorney for the Plaintiff,
United States of America

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. |
| | : | |
| v. | : | **COMPLAINT AND JURY DEMAND** |
| | : | |
| C. ABBONIZIO CONTRACTORS, INC. and PETER ABBONIZIO, | : | |
| | : | |
| | : | Document Electronically Filed |
| Defendants. | : | |
| | : | |

Plaintiff, United States of America (the "United States"), by its attorney, Craig Carpenito, United States Attorney for the District of New Jersey, and Mark C. Orlowski, Assistant United States Attorney, by way of this Complaint against defendants C. Abbonizio Contractors, Inc. ("Abbonizio Contractors") and Peter Abbonizio, alleges as follows:

## JURISDICTION AND VENUE

1.     The United States brings claims of fraud, unjust enrichment, and payment by mistake under the common law, and claims under the False Claims Act, 31 U.S.C. §§ 3729-3733, arising from the submission of false claims in

1

connection with federally funded contracts between prime contractor PKF Mark III ("PKF") and the State of New Jersey, which were awarded in part based PKF's representations that it would utilize certain Disadvantaged Business Entity ("DBE") companies, which were procured by Abbonizio Contractors, in performing the work under the contract.

2.      The United States District Court for the District of New Jersey has subject matter jurisdiction over this matter, pursuant to 28 U.S.C. § 1345, which provides for original jurisdiction of civil actions commenced by the United States of America, or by any agency or officer expressly authorized to sue.

3.      This Court has personal jurisdiction and venue over defendants, pursuant to 31 U.S.C. § 3732(a), because Defendants Abbonizio Contractors and Peter Abbonizio are located and transact business within New Jersey, and because the relevant conduct of Defendants, including acts proscribed by 31 U.S.C. § 3729, occurred in this district.

## PARTIES

4.      Plaintiff is the United States of America.

5.      Defendant Abbonizio Contractors is a privately owned company that is, and was at all relevant times, located in New Jersey.  Abbonizio Contractors' listed address is 1850 Hurffville Road, Sewell, New Jersey 08080.

6.      Defendant Peter Abbonizio is a resident of New Jersey, and at all times relevant herein, was the President of Defendant Abbonizio Contractors.

## SUMMARY OF ALLEGATIONS

7.      By this action, the United States brings claims under the False Claims Act against Defendants for damages and civil penalties, common law fraud, unjust enrichment, and payment by mistake.

8.      Defendants circumvented small business set aside requirements in federally-funded contracts requiring the use of certified DBEs for work performed on those contracts.

9.      Specifically, Defendants represented that they were using certified DBEs for commercially useful functions on the federally funded contracts at issue, when in actuality, the DBEs were simply being used as pass through entities to invoice for work that they did not perform.

10.      Defendants fraudulent representations of the use of the certified DBEs to the prime contractor, PKF, caused PKF to misrepresent to the State of New Jersey that the DBEs were being used for a commercially useful function.

11.      The use of DBEs to perform a commercially useful function was a material requirement for payment to be made under the contracts.

12.      Defendants' misrepresentations caused federal funds to be paid on the contract that should not have been paid, because the necessary percentage of DBEs performing a commercially useful function on the contract was being misrepresented and/or not being met.

13.      Thus, the United States has been damaged by Defendants' false and fraudulent misrepresentations.

## SUMMARY OF LAW AND THE DBE PROGRAM

14.    The False Claims Act provides that any person who presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States, or knowingly makes, uses or causes to be made or used false records and statements to induce the United States to pay or approve claims, is liable for civil penalties for each such claim, plus three times the amount of the damages sustained by the United States. *See* 31 U.S.C. § 3729(a).

15.    The False Claims Act defines "knowingly" to include acts committed with "actual knowledge," as well as acts committed "in deliberate ignorance" or "reckless disregard" of their truth or falsity. Liability attaches when a defendant seeks, or causes others to seek, payment that is unwarranted from the United States. *See* 31 U.S.C. § 3729(b).

16.    The United States Department of Transportation ("USDOT") provides billions of dollars annually to state and local governments for the purpose of public construction projects.

17.    The Federal Highway Administration ("FHWA"), an agency within the USDOT, provides funding for the construction and improvement of highways and bridges.

18.    Congress first established goals to hire DBE companies in 1983 by passing the Surface Transportation Assistance Act ("STAA"), which required that not less than 10% of appropriated transportation funds be spent on DBEs owned

and controlled by economically disadvantaged individuals.  *See* Pub.L.No. 97-424 (January 6, 1983).

19.     The federal DBE program, has been reauthorized several times by Congress, including as recently as 2015 in the Fixing America's Surface Transportation Act, Pub. L. No. 114-94, § 1101(b), 129 Stat. 1312, 1323-25 (2015).

20.     Pursuant to the Congressional authorization provided to the DBE program, the USDOT has developed regulations governing the program in Title 49 of the United States Code of Federal Regulations.

21.     The stated objective of the DBE program is to, among other things, "ensure non-discrimination in the award and administration of DOT-assisted contracts", and "[t]o create a level playing field on which DBEs can compete fairly for DOT-assisted contracts."  *See* 49 C.F.R. § 26.1.

22.     The DBE regulations further promote assistance in the development of DBEs, so that they can successfully compete in the marketplace outside the DBE program.  *See* 49 C.F.R. § 26.35.

23.     The federal DBE program sets a national goal of spending at least 10% of federal highway funds by contracting with disadvantaged businesses.  *See* 49 C.F.R. § 26.41.

24.     The success of the DBE program depends upon the establishment and enforcement of procedures that ensure only bona fide DBEs participate in the program, and that the DBEs are actually doing the work claimed as DBE credit.

25.     As a condition of receiving DOT funding for public construction projects, state and local governments receiving federal funding must establish goals for DBE participation in their federally-funded programs, and enforce the federal guidelines for DBE participation.  *See* 49 C.F.R. § 26.45.

26.     State and local contracts receiving federal funding may only be awarded to a bidder who makes good faith efforts to meet the DBE goal.  *See* 49 C.F.R.  26.53(a).

27.     To determine that a bidder has made a good faith effort to meet the DBE goal, the bidder must either document that it obtained enough DBE participation to meet the goal, or document that it made good faith efforts to meet the goal, even if it did not succeed in obtaining sufficient DBE participation.  *See* 49 C.F.R. 26.53(a).

28.     Meeting the good faith effort obligations for achieving DBE participation on federally funded contracts is a material requirement for both the award of a contract and continued payment under the contract once it has been awarded.

29.     In solicitations issued for DOT-assisted contracts where a DBE goal has been established, award of the contract is conditioned upon a good faith effort to meet the DBE goals.  *See* 49 C.F.R. 26.53(b)(1).

30.     In conjunction with a bid, each of the bidders must submit, among other things, (1) the names and addresses of the DBE firms that will be participating in the contract, (2) a description of the work to be performed by each

DBE, (3) the dollar amount of each DBE's participation, (4) written documentation of the bidder's commitment to use a DBE subcontractor that it submits to meet a contract goal, (5) written confirmation from each DBE to be used that it is participating in the contract, and (6) if the contract goal is not met, evidence of good faith efforts, including bids from DBE and non-DBE subcontractors.  *See* 49 C.F.R. § 26.53(b)(2).

31.     A DBE is defined as a business "(1) [t]hat is at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged, or in the case of a corporation, in which 51 percent of the stock is owned by one or more such individuals; and (2) [w]hose management and daily business operations are controlled by one or more of the socially and economically disadvantaged individuals who own it."  *See* 49 C.F.R. 26.5.

32.     In order to fulfill the DBE requirements on a project, prime contractors are permitted to subcontract out work to DBEs in order to meet the DBE goal in a particular project.

33.     The DOT's regulations govern the requirements prime contractors must meet when using subcontractors for a project to claim DBE credit.

34.     Under the regulations, only the work actually performed by a DBE should count towards the DBE goals.  *See* 49 C.F.R. § 26.55.

35.     If a DBE further subcontracts work to another company, the value of the work subcontracted by the DBE may only be counted as DBE credit if the DBE's subcontractor is also a DBE.  *See* 49 C.F.R. § 26.55(a)(3).

36.     A contractor may only claim DBE credit for work that is done by a DBE that performs a commercially useful function ("CUF").  *See* 49 C.F.R. 26.55(c).

37.     A DBE performs a CUF when "it is responsible for execution of the work of the contract and is carrying out its responsibilities by actually performing, managing, and supervising the work involved."  *See* 49 C.F.R. § 26.55(c)(1).

38.     With respect to materials and supplies used on a contract, in order for a DBE to perform a CUF, the DBE must be responsible for "negotiating price, determining quality and quantity, ordering the material, and installing (where applicable) and paying for the material itself."  *See* 49 C.F.R. § 2655(c)(1).

39.     In addition, the regulations clearly indicate that a DBE is not performing a CUF if it is merely a pass through for funds.  Specifically, the regulation states, in pertinent part, "[a] DBE does not perform a commercially useful function if its role is limited to that of an extra participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of DBE participation."  *See* 49 C.F.R. § 26.55(c)(2).

40.     For material suppliers, a contractor can claim 100 percent of the DBE subcontract if the DBE is a manufacturer, which is defined as "a firm that operates or maintains a factory or establishment that produces, on the premises, the materials, supplies, articles, or equipment required under the contract and of the general character described by the specifications."  *See* 49 C.F.R. 26.55(e)(1).

41.     If the materials are supplied by a DBE regular dealer, which is a "firm that owns, operates, or maintains a store, warehouse, or other establishments in

which the materials, supplies, articles or equipment of the general character described by the specifications and required under the contract are bought, kept in stock, and regularly sold or leased to the public in the usual course of business", the contractor can claim 60% of the cost of the materials or supplies towards their DBE goals.  *See* 49 C.F.R. § 26.55(e)(2).

42.     If a DBE is neither a manufacturer nor a regular dealer, DBE credit may only be claimed for the fees or commissions charged for assistance in the procurement of the materials, provided they are reasonable and customary.  The cost of the materials and/or supplies is not to be counted as credit towards the DBE goals.  *See* 49 C.F.R. § 26.55(e)(3).

43.     In connection with clarifying the regulations, the General Counsel of the USDOT has issued guidance in the form of a document entitled "Official Questions and Answers (Q&A's) Disadvantaged Business Enterprise Program Regulation (49 CFR 26)" (the "Official Questions and Answers").  *See* https://www.transportation.gov/sites/dot.gov/files/2020-01/docr-20180425-001part26qa.pdf.

44.     The Official Questions and Answers represent the institutional position of the USDOT and provide guidance and information to help companies comply with the DBE program requirements.

45.     Although not mandatory or binding as the only way to satisfy the DBE requirements, the Official Questions and Answers provide information to "provide

clarity to the public regarding existing requirements under the law or agency policies." *See id.* at 1.

46.     The Official Questions and Answers posted guidance in May 2012 regarding how recipients of contracts should evaluate the CUF performed by DBEs in a "furnish and install" contract. *See id.* at 38.

47.     Since "furnish and install" contracts involve the supply of materials, the Official Questions and Answers are also applicable to whether material suppliers perform a CUF for the purpose of claiming DBE credit.

48.     The Official Questions and Answers note that to claim DBE credit for the supply of materials, the DBE must "perform all functions identified in section 26.55(c)(1). These are (1) negotiating price; (2) determining quality and quantity; (3) ordering the material; and (4) paying for the material itself. If the DBE does not perform all four of these functions, it has not performed a CUF with respect to obtaining the materials, and the cost of the materials could not be counted towards DBE goals." *See id.* at 39.

49.     Although industry practices may be considered under 49 C.F.R. § 26.55(c), the Official Questions and Answers make clear that the language relating to industry practices does not override the requirement that the DBE perform all four of the enumerated functions listed by 49 C.F.R. § 26.55(c). *See id.*

50.     The Official Questions and Answers also make clear that if a subcontractor cannot perform all four functions, DBE credit should not be claimed with respect to the work of that subcontractor. The Official Questions and Answers

state, in pertinent part, "[t]he Department understands that there may be some kinds of transactions in which no subcontractor performs one of the four required functions (e.g., a prime contractor decides who will supply a commodity and at what price, with the result that a subcontractor cannot negotiate the price for the item). In such situations, the way the transaction occurs does not lend itself to the performance of a CUF by a DBE subcontractor, and it is not appropriate to award DBE credit for the acquisition of the commodity by the DBE subcontractor." *See id.*

## FACTUAL ALLEGATIONS

### The Direct Connection Project

51.     In February, 2009, the American Recovery and Reinvestment Act ("ARRA") was enacted by Congress as part of a stimulus package to combat an ongoing recession in the United States.  *See* Public Law 111-5, 123 Stat. 115 (2009).

52.     The ARRA provided, in part, funding for infrastructure improvements in various states, including New Jersey.  *See id.*

53.     The New Jersey Department of Transportation ("NJDOT") was allocated funding under ARRA, and proposed various infrastructure projects, including projects to improve the state's roadways.

54.     In connection with ARRA-funded projects, the State of New Jersey proposed to make infrastructure improvements to its interstate roadways and their related interchanges.

55.     The intersection of routes I-295, I-76, and Route 42, located in Camden County, New Jersey is one of the busiest interchanges in New Jersey.

56.     NJDOT developed alternative ramp configurations at that interchange that would permit vehicles on I-295 to travel over the interchange without the need for exit ramps or lane changes.

57.     The proposed project was called the "Direct Connection Project".

58.     The Direct Connection Project entailed building 10 new bridges, a bridge widening, a bridge rehabilitation, two temporary bridge structures, 22 retaining walls, over 40 new sign structures, and over 15,000 feet of noise walls.

59.     Presumably, because of the scope and length of the Direct Connection Project, the total project was broken into four major construction contracts that were put out to bid.

60.     The bid opening for the first contract for the Direct Connection Project (the "Contract") was held on December 4, 2012, and five bids were received by the NJDOT.

61.     In connection with the bids, the bidders submitted a Disadvantaged Business Enterprise/Emerging Small Business Enterprise Affirmative Action Plan ("D/ESBE Affirmative Action Plan"), which detailed how the bidder anticipated reaching the DBE goal of 15% specifically required for the project, and contained a listing of DBEs that the bidder anticipated using on the project.

62.     PKF, a construction company located in Newtown, Pennsylvania, was the low bidder on the project.

63.     On or about January 10, 2013, the NJDOT recommended to award PKF the Contract for the Direct Connection Project.

64.   As part of the recommendation, PKF's D/ESBE Affirmative Action Plan was reviewed by the New Jersey Division of Civil Rights/Affirmative Action and was found to be acceptable.

65.   PKF's D/ESBE Affirmative Action Plan submitted in conjunction with its bid contained proposed subcontracts for Sanzo, Ltd. ("Sanzo"), a female-owned business owned by Carol Sanzo, located in Cranford, New Jersey, to furnish and deliver diesel fuel and lubricants.

66.   PKF's D/ESBE Affirmative Action Plan proposed contracts with Sanzo in the amount of $3,140,000, resulting in a proposed DBE credit of $1,884,000, based upon the 60% regular dealer rate.

67.   PKF's D/ESBE Affirmative Action Plan submitted in conjunction with its bid also contained proposed subcontracts for Multifacet, Inc. ("Multifacet"), a minority-owned business owned by Felton Walker, located in Cherry Hill, New Jersey, to furnish and deliver castings, reinforced concrete pipe, and precast fabrications.

68.   PKF's D/ESBE Affirmative Action Plan proposed contracts with Multifacet in the amount of $1,603,000, resulting in a proposed DBE credit of $1,130,400 based upon the 60% regular dealer rate.

69.   PKF's D/ESBE Affirmative Action Plan proposed DBE credits of approximately 15.02% of the total contract value, which was .02% above the DBE goals required by the project.

70.     If the proposed DBE credit for Sanzo or Multifacet was not included in PKF's D/ESBE Affirmative Action Plan, PKF's bid proposal would not have reached the required 15% DBE goal imposed on the contract.

71.     Based, in part, on the recommendation provided to the NJDOT by the Division of Civil Rights and Affirmative Action, which was based in part upon the representations made by PKF concerning planned DBE participation, among other things, PKF was awarded the Contract on or about January 18, 2013.

72.     The terms of the Contract included several addenda, including 8 attachments from the FHWA.

73.     FHWA Attachment No. 1, incorporated into the Contract, specifically states, "The requirements of 49 CFR Part 26 and the State DOT's U.S. DOT-approved DBE program are incorporated by reference." *See* Contract, FHWA Attachment No. 1, page 3.

74.     Moreover, FHWA Attachment No. 5, incorporated into the Contract, notes, in pertinent part, "It is the policy of the NJDOT that Disadvantaged Business Enterprises, as defined in 49 CFR, Part 26 . . . shall have equal opportunity to participate in the performance of contracts financed in whole in part with federal funds under this agreement.  Consequently, the DBE requirements of 49 CFR, Part 26, Subsections A, C and F apply to this agreement." *See* Contract, FHWA Atachment No. 5, page 1.

75.     49 C.F.R. § 26.55, detailing the requirements for a DBE subcontractor to perform a CUF, is located in Subsection C to 49 C.F.R. Part 26, and thus is specifically incorporated into the Contract.

76.     FHWA Attachment No. 5 sets a goal of awarding 15 percent of the total contract value to DBE subcontractors, equipment lessors, and/or material suppliers for the Contract.  *See id.*

77.     Under FHWA Attachment No. 5, contractors are required to make a good faith effort to meet the DBE goals, and document those requests.  *See id.* at page 3.

78.     In addition to incorporating the language of 49 C.F.R. § 26.55, FHWA Attachment No. 5 details when claiming DBE participation credit is permitted, including the requirement that the DBE subcontractor perform a CUF. *See id.* at page 2.

79.     FHWA Attachment No. 5 also requires that the contractor maintain records necessary to determine compliance with the DBE obligations, including the names of the DBE contractors, the type of work, the amount subcontracted and awarded to DBEs, and records of DBEs and non-DBEs that submitted quotes/bids to the contractor.

80.     Further, FHWA Attachment No. 5 indicates that the contractor must submit reports, as required by the NJDOT, on contracts and business transactions with DBEs.

81.     In conjunction with the DBE participation on the Direct Connection Project, the NJDOT required that PKF submit a monthly form detailing DBE participation.  The form is the New Jersey Form CR-267, the Division of Civil Rights & Affirmative Action Monthly Report, Utilization of ESBE/DBE or SBE.

82.     The Form CR-267 contained information similar to that required by FHWA Attachment No. 5, including the name of the D/ESBE or SBE, the description of the work performed and/or materials provided, the bid amount, and the amounts paid.

83.     Upon information and belief, PKF submitted the Form CR-267 on a monthly basis to the NJDOT during the pendency of the Contract, as part of its reporting requirements for DBE participation credits.

84.     Some of the work reported on the Form CR-267 by PKF was for work performed by DBEs that were working on subcontracts issued by PKF to other firms, including Abbonizio Contractors, for the Direct Connection Project.

**PKF's Subcontract with Abbonizio Contractors**

85.     On or about February 28, 2013, PKF entered into a subcontract with Abbonizio Contractors for Abbonizio Contractors to perform work for the Contract on the Direct Connection Project (the "Subcontract").

86.     The total initial price of the Subcontract was $39,108,075.12 to perform "ALL SITEWORK (EARTHWORK AND PIPE INSTALLATION)".

87.     A document entitled Subcontract Terms and Conditions, set forth in Exhibit H to the Subcontract, was incorporated into and made a part of the Subcontract.

88.     Section 48 of the Subcontract Terms and Conditions specified that Abbonizio Contractors was contractually obligated to comply with certain provisions of the Contract, including but not limited to, FHWA Attachment No. 1 and FHWA Attachment No. 5.

89.     Accordingly, Abbonizio Contractors was contractually bound by PKF to comply with the regulations of 49 C.F.R. Part 26 and the NJDOT's DBE program, as set forth in FHWA Attachment No. 1.

90.     Moreover, Abbonizio Contractors was contractually obligated to comply with the same DBE goals as PKF in the Contract.

91.     Thus, in executing the Subcontract with the Subcontract Terms and Conditions, Abbonizio Contractors was required to hire DBE contractors to meet the 15% mandated goal of the DBE program on its subcontracted portion of the Contract.

92.     Peter Abbonizio personally signed the Subcontract on or about February 22, 2013, as President of Abbonizio Contractors.

93.     The Subcontract signed by Peter Abbonizio also contained a New Jersey Department of Transportation Form DC-18A-12/08, which is the NJDOT's Request for Approval to Sublet on Projects Using the 2007 Specifications (the "Form DC-18A").

94.     The Form DC-18A contained a Certification of Inclusion of Required Contract Provisions.

95.     The Certification of Inclusion of Required Contract Provisions is a certification that certain required contract provisions have been included and are made a part of the signed agreement between the contractor and the subcontractor.

96.     The Certification of Inclusion of Required Contract Provisions included FHWA Attachment No. 1, Required Contract Provisions for Federal Aid Construction Contracts, and the FHWA Attachment No. 5, Disadvantaged Business Enterprise Utilization Attachment – FHWA Funded Contracts, among others, as documents that were required to be made part of the Subcontract between PKF and Abbonizio Contractors.

97.     Peter Abbonizio personally signed the Form DC-18A on February 22, 2013, and his signature was notarized by Kimberly Hullfish, a notary public and the Controller of Abbonizio Contractors.

98.     Peter Abbonizio thus personally certified to the NJDOT that he was aware that the provisions of FHWA Attachment No. 1 and FHWA Attachment No. 5 were applicable to the Subcontract.

99.     Peter Abbonizio knew or should have known at the time he executed both the Subcontract and the Form DC-18A that Abbonizio Contractors was bound to the provisions set forth in the Contract relating to the 15% DBE goal.

100.    Peter Abbonizio knew or should have known at the time he executed both the Subcontract and the Form DC-18A that Abbonizio Contractors was

18

required to comply with the federal DBE program requirements of 49 C.F.R. Part 26, inclusive of 49 C.F.R. § 26.55.

101.   Peter Abbonizio and Abbonizio Contractors thus knew or should have known at the time that they entered into the Subcontract that in order for a claim of DBE credit to be valid, a DBE subcontractor or supplier was required to perform a CUF.

102.   Peter Abbonizio and Abbonizio Contractors also knew or should have known at the time that they entered into the Subcontract that in order for a claim of DBE credit to be valid, a DBE subcontractor or supplier for which DBE credit was to be claimed could not merely be a "pass-through" contractor.

103.   Despite the fact that Peter Abbonizio and Abbonizio Contractors knew or should have known that pass-through entities could not be used for DBE participation credit, they nevertheless transmitted information to PKF regarding work performed by pass-through entities in order for PKF to claim DBE participation credit.

104.   Over a period of several years, PKF reported to the NJDOT on its monthly Form CR-267 reports DBE participation credit that claimed DBE credit for pass-through entities.

105.   The pass-through credits claimed by PKF included both Sanzo and Multifacet, which were a direct result of the subcontract with Abbonizio Contractors.

**The Scheme to Use Sanzo as a Pass-Through**

106.   Abbonizio Contractors uses trucks and equipment to perform its construction work, and needs a fuel supplier to supply both its trucks and its yard with fuel.

107.   Taylor Oil Company, Inc. ("Taylor Oil") is a fuel supplier based in Bellmawr, New Jersey.

108.   Since approximately 2010, other than the Direct Connection Project, Abbonizio Contractors always used Taylor Oil as its fuel supplier.

109.   On the Direct Connection Project, however, Abbonizio Contractors did not directly utilize Taylor Oil as its fuel supplier, instead choosing to have fuel supplied by Taylor Oil through Sanzo, solely in order to claim DBE credit.

110.   Sanzo was a company based in Cranford, New Jersey, and did not have any trucks or truck drivers.

111.   In or about December, 2012, a representative of Taylor Oil received a call from Al Facenda, the Purchasing Manager for Abbonizio Contractors, inquiring about obtaining a minority owned company to provide fuel oil.

112.   In or around January 2013, Taylor Oil provided Abbonizio Contractors with Sanzo as a potential minority owned company for DBE participation.

113.   The arrangement called for Taylor to deliver the fuel for Abbonizio Contractors, but sell it to Sanzo.  Sanzo would then bill Abbonizio Contractors for the fuel delivered by Taylor Oil.

114.    Under the arrangement between Abbonizio Contractors, Sanzo, and Taylor Oil, Abbonizio Contractors would place orders directly with Taylor Oil, and Taylor Oil would then invoice Sanzo for the fuel delivered to the Direct Connection Project.  Sanzo would subsequently bill Abbonizio Contractors for the delivered fuel based on Taylor Oil's invoices.

115.    Abbonizio Contractors had never worked with Sanzo prior to the Direct Connection Project.

116.    Abbonizio Contractors did not negotiate the price of fuel with Sanzo for the Direct Connection Project.

117.    Abbonizio Contractors paid the same price to Sanzo that it would have paid Taylor Oil for the fuel delivered for the Direct Connection Project, which was 43 cents above the posted price from Duck Island, a regional fuel supplier that provided the fuel to Taylor Oil, and ultimately Sanzo through Taylor.

118.    For its participation in the scheme as the DBE pass through entity, Sanzo was paid a percentage for each gallon of fuel delivered to the Abbonizio Contractors' job site by Taylor Oil.

119.    Abbonizio Contractors' employees were aware of the fact that Taylor Oil trucks and drivers were delivering fuel to the Abbonizio Contractors' job sites, and then billing those same deliveries through Sanzo invoices.

120.    Sanzo used Taylor Oil's trucks and drivers to deliver fuel to Abbonizio Contractors' job site on the Direct Connection Project.

121.    To conceal the scheme, magnetic signs with "Sanzo, LTD." printed on them were made for use with fuel deliveries by Taylor Oil trucks and drivers to Direct Connection Project worksites on deliveries that were supposed to be made by Sanzo.

122.    The magnetic sign with Sanzo's information was attached to a Taylor Oil truck when making deliveries to the Direct Connection Project job site on behalf of Sanzo for Abbonizio Contractors.

123.    Abbonizio Contractors' employees were also aware that magnetic signs were being put on Taylor Oil trucks so that deliveries would look like they were being made by Sanzo.

124.    In order to maintain the fiction that fuel was being delivered with Sanzo trucks, Sanzo and Taylor entered into a sham lease agreement in March, 2013 (the "Lease Agreement").

125.    The Lease Agreement does not grant exclusive use of a truck – it is only for priority to operate the leased fuel truck.

126.    The Lease Agreement also purportedly leases the services of Taylor Oil's truck driver.

127.    The Lease Agreement does not provide a rate or mechanism for the payment of Taylor Oil's truck driver.

128.    The Lease Agreement does not provide for any payment by Sanzo to Taylor Oil for use of Taylor Oil's truck and/or driver.

129.   Accordingly, the terms of the Lease Agreement essentially provide a no-cost lease of a truck and driver from Taylor Oil to Sanzo for the purpose of making deliveries to Sanzo's customer.

130.   Upon information and belief, the only fuel customer Sanzo maintained at the time of the lease was Abbonizio Contractors.

131.   Initially, deliveries made by Sanzo were made using Taylor Oil delivery tickets, on which the Taylor Oil name was scratched out, and Sanzo's name was handwritten.

132.   Sanzo subsequently had delivery tickets with "Sanzo, Ltd." preprinted on them for deliveries to the Direct Connection Project job site for Abbonizio Contractors.

133.   Presumably, because Sanzo delivery tickets were using Taylor Oil's truck and driver, some of the delivery tickets noted delivery by Taylor Oil when the delivery was purportedly made by Sanzo and had Sanzo's name pre-printed on the tickets.

134.   Deliveries of fuel to the Direct Connection Project purportedly by Sanzo, but in reality made by Taylor Oil using Sanzo as a pass-through for invoicing, were made for several months.

135.   The deliveries made by Taylor Oil were billed to Sanzo, who then invoiced Abbonizio Contractors for the deliveries.

136.   The Taylor Oil deliveries and Sanzo invoices were reconciled periodically, and Abbonizio Contractors' employees knew about the reconciliations.

137.    Abbonizio Contractors' employees knew that Sanzo did not negotiate the price of the fuel, that Taylor Oil trucks were making the deliveries, and that Abbonizio Contractors was ordering the fuel directly from Taylor Oil, its normal fuel supplier.

138.    Peter Abbonizio knew or should have known that Sanzo was not performing a CUF, and that Abbonizio Contractors could not claim DBE participation credit for any of the fuel invoiced by Sanzo.

139.    Accordingly, defendants were aware that Sanzo was not performing a CUF for the project and was merely acting as a pass-through for invoicing.

140.    Nevertheless, despite knowledge that Sanzo did not perform a CUF, Abbonizio Contractors transmitted to PKF information that Sanzo was delivering fuel, for the purpose of having PKF include Sanzo's billed work as DBE participation credit.

141.    Based on the information transmitted by Abbonizio Contractors, PKF transmitted multiple times the monthly Form CR-267 to the NJDOT detailing DBE participation on the Direct Connection Project that included the work invoiced by Sanzo to Abbonizio Contractors.

142.    As of January 2017, PKF had claimed $169,610.80 in DBE participation credit directly attributable to "work" invoiced by Sanzo to Abbonizio Contractors.

## The Scheme to Use Multifacet as a Pass-Through

143.    As part of the Subcontract, Abbonizo Contractors was responsible for installing pipe, which included precast concrete piping and iron sewer piping.

144.    On prior jobs, Abbonizio Contractors had worked with several pipe suppliers, including Bridgestate Foundry Corporation ("Bridgestate"), located in Berlin, New Jersey, Oldcastle Precast ("Oldcastle"), located in Easton, Pennsylvania, and Garden State Precast ("Garden State"), located in Farmingdale, New Jersey.

145.    The scope of work in Abbonizio Contractors' Subcontract with PKF called for over $4.7 million in either concrete or iron pipe.

146.    In addition, the Subcontract scope of work called for over $9.9 million in retaining walls for the Direct Connection Project, which are typically made with precast materials.

147.    Bridgestate, Oldcastle, and Garden State are not DBE suppliers of precast materials.

148.    Multifacet is a DBE company.

149.    Prior to Multifacet's involvement, Garden State and Oldcastle provided pricing to Abbonizio Contractors in connection with supplying material for the Direct Connection Project.

150.    As part of its discussions with Garden State, Abbonizio Contractors requested that Garden State supply Abbonizio Contractors with a DBE contractor.

151.    A Garden State representative suggested Multifacet as a DBE contractor.

152.    Multifacet was brought in as a pass-through entity so that Abbonizio Contractors could claim DBE participation credit through PKF on the Direct Connection Project.

153.    The prices for the project were pre-arranged between Abbonizio Contractors and its true vendors before Multifacet's involvement, and Multifacet did not negotiate prices with any of the materials suppliers used on the Direct Connection Project.

154.    Garden State and Oldcastle's prices to Abbonizio Contractors were established before Multifacet was involved in the Direct Connection Project.

155.    Garden State and Oldcastle agreed to reduce their prices to accommodate for Multifacet's commission to invoice the materials as a pass-through.

156.    Felton Walker, Multifacet's owner, negotiated a commission with each of the material suppliers, which was added to the actual supplier's invoices before being sent to Abbonizio Contractors in the form of a Multifacet invoice for payment.

157.    Since the prices and vendors were pre-established before Multifacet's involvement in the project, Multifacet only charged a minimal markup.

158.    Multifacet's billing system was designed to automatically add the markup from the invoices received from Abbonizio Contractors' vendors to generate invoices to Abbonizio Contractors.

159.   The materials purportedly supplied by Multifacet were production items, and were drop shipped to the job site.

160.   Abbonizio Contractors coordinated directly with its vendors, Garden State, Oldcastle, and Bridgestate for shipment and delivery of the materials.

161.   Multifacet typically did not coordinate delivery of materials to the job site for shipments from Garden State, Oldcastle, and Bridgestate.

162.   The materials shipped to Abbonizio Contractors' job site at the Direct Connection Project were not shipped to Multifacet or delivered by Multifacet – they were delivered directly from the vendors, such as Garden State, Oldcastle or Bridgestate.

163.   Multifacet did not pay its vendors until it received payment from Abbonizio Contractors.

164.   Once Multifacet received payments from Abbonizio Contractors, it would deduct its commission, and make payment to the vendor.

165.   On several occasions, Garden State called Abbonizio Contractors to complain about payment being late for materials that were purportedly supplied by Multifacet to Abbonizio Contractors.

166.   Change orders on the Direct Connection Project, and the prices associated with them, were negotiated between Abbonizio Contractors and the vendors.  Multifacet was not involved in the price negotiation.

167.   Because Multifacet did not negotiate price, determine quantity or quality, order the materials, and/or pay for the materials with its own funds, it did not perform a CUF.

168.   Multifacet employees knew that they were not performing a CUF, and acknowledged that the relationship with Abbonizio Contractors was merely a pass-through relationship.

169.   Abbonizo Contractors' employees knew that Multifacet did not negotiate price, determine quantity or quality, order the materials, and/or pay for the materials.

170.   Peter Abbonizio knew or should have known that Multifacet was not performing a CUF, and that Abbonizio Contractors could not claim DBE participation credit for any of the materials invoiced by Multifacet.

171.   Accordingly, Abbonizio Contractors' employees knew that Multifacet was not performing a CUF, was merely a pass-through, and thus the materials delivered and invoiced by Multifacet were not eligible for DBE participation credit.

172.   Nevertheless, and despite knowing that Multifacet did not perform a CUF, Abbonizio Contractors transmitted to PKF information that Multifacet was providing materials for the Direct Connection Project, for the purpose of having PKF include Multifacet's billed work as DBE participation credit.

173.   Based on the information transmitted by Abbonizio Contractors, PKF transmitted multiple times the monthly Form CR-267 to the NJDOT detailing DBE

participation on the Direct Connection Project that included the work invoiced by Multifacet to Abbonizio Contractors.

174.    As of January 2017, PKF had claimed $1,403,346.21 in DBE participation credit directly attributable to "work" invoiced by Multifacet for Abbonizio Contractors.

## COUNT ONE

**[False Claims Act – Causing to Be Presented False or Fraudulent Claims to the United States, 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(C) – Fraud in the Inducement]**

175.    The United States repeats and re-alleges the allegations set forth in all of the preceding paragraphs as if set forth fully at length herein.

176.    Prior to the award of the Contract, Defendants provided PKF with information relating to their use of subcontractors, including Multifacet and Sanzo, for DBE participation credit on a proposed subcontract between PKF and Abbonizio Contractors on the Direct Connection Project.

177.    At the time Defendants provided that information to PKF, Defendants knew or should have known that certain subcontractors, including Multifacet and Sanzo, were not going to perform a CUF, and thus were not eligible for DBE participation credit.

178.    PKF included the information provided by Defendants in the bid package and D/ESBE Affirmative Action Plan that demonstrated that PKF would reach a 15% DBE participation goal.

179.    Without the inclusion of the subcontractor information provided by Abbonizio Contractors, including Sanzo and Multifacet's DBE participation in the bid package and D/ESBE Affirmative Action Plan, PKF's DBE participation goal would have been below 15%, and PKF would not have been awarded the Contract.

180.    Payments of federal funds were made under the Contract following the award of the contract, which would not have been awarded but for Defendants' false reporting to PKF.

181.    Thus, as set forth above, in connection with the foregoing schemes, Defendants and their co-conspirators knowingly, or with deliberate ignorance or in reckless disregard for the truth, conspired to submit or cause to be submitted, a false claim, or conspired to make, use or cause to be made or used false records and statements material to false and fraudulent claims that were made to the United States, and took actions to further these conspiracies.  The false claims/records that Defendants caused to be submitted directly resulted in the award of the Contract to PKF, which would otherwise not have been awarded to it.

182.    By reason of these false claims, the United States has sustained damages in an amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

## COUNT TWO

**[False Claims Act – Causing to Be Presented False or Fraudulent Claims to the United States, 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(C)]**

183.    The United States repeats and re-alleges the allegations set forth in all of the preceding paragraphs as if set forth fully at length herein.

184.   During the pendency of the Contract, Defendants provided PKF with information relating to their use of subcontractors, including Multifacet and Sanzo, for DBE participation credit on a proposed subcontract between PKF and Abbonizio Contractors on the Direct Connection Project.

185.   At the time Defendants provided that information to PKF, Defendants knew or should have known that the proposed subcontractors, including Sanzo and Multifacet, had not performed a CUF, and thus were not eligible for DBE participation credit.

186.   At the time Defendants provided that information to PKF, Defendants were aware that PKF would utilize that information to include on its reports to the NJDOT to establish compliance with its DBE participation requirements.

187.   PKF did in fact use the information provided by Defendants to report false DBE participation information on a monthly basis to the NJDOT.

188.   Payments of federal funds were made under the Contract following the false reporting by PKF, which was the direct result of Defendants' false reporting to PKF.

189.   Thus, as set forth above, in connection with the foregoing schemes, Defendants and their co-conspirators knowingly, or with deliberate ignorance or in reckless disregard for the truth, conspired to submit or cause to be submitted, a false claim, or conspired to make, use or cause to be made or used false records and statements material to false and fraudulent claims that were made to the United States, and took actions to further these conspiracies.

190.    By reason of these false claims, the United States has sustained damages in an amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## COUNT THREE

### [Violations of the False Claims Act – Making or Using a False Record or Statement, 31 U.S.C. § 3729(a)(1)(B)]

191.    The United States repeats and re-alleges the allegations set forth in all of the preceding paragraphs as if set forth fully at length herein.

192.    In connection with the foregoing schemes, Defendants knowingly, or with deliberate ignorance or in reckless disregard for the truth, made, used or caused to be made and used, false records and statements material to false and fraudulent claims that were ultimately made to the United States.

193.    By reason of the aforementioned false claims, the United States has sustained damages in an amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## COUNT FOUR

### [Common Law Fraud]

194.    The United States repeats and re-alleges the allegations set forth in all of the preceding paragraphs as if set forth fully at length herein.

195.    Defendants made knowing material misrepresentations of fact, in connection with claims for payment submitted by, or on behalf of, Defendants, to the NJDOT, which resulted in the payment of federal funds.

196.    Defendants intended that the NJDOT and the United States rely upon the accuracy of the false representations referenced above.

197.    The United States in fact relied upon the accuracy of the false representations referenced above when it released federal funds to be paid.

198.    The United States made substantial payments of money in justifiable reliance upon Defendants' false representations.

199.    Defendants' actions caused the United States to sustain damages in an amount to be determined at trial.

## COUNT FIVE

### [Unjust Enrichment]

200.    The United States repeats and re-alleges the allegations set forth in all of the preceding paragraphs as if set forth fully at length herein.

201.    By reason of the payments of federal funds made to Defendants, Defendants were unjustly enriched.

202.    The circumstances of Defendants' receipt of contracts that relied upon DBE participation requirements, and subsequent payments by the United States are such that, in equity and good conscience, Defendants are liable to account for and pay such amounts which were paid to them that should not have been paid.

## COUNT SIX

### [Payment by Mistake]

203.    The United States repeats and re-alleges the allegations set forth in all of the preceding paragraphs as if set forth fully at length herein.

204.   This is a claim for the recovery of monies paid by the United States to Defendants by mistake.

205.   The United States, acting in reasonable reliance on the accuracy and truthfulness of the information contained in the claims, paid certain sums of money to which Defendants were not entitled, and are thus liable to account and pay such amounts back to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands judgment against the Defendants for damages, civil penalties, attorneys' fees, costs, and any other relief that the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a trial by jury in this case.

Respectfully submitted,

CRAIG CARPENITO
United States Attorney

*s/ Mark C. Orlowski*
By: MARK C. ORLOWSKI
Assistant U.S. Attorney

Dated:  May 29, 2020